May it please the Court, Tom Dupree on behalf of the United States I'd like to reserve four minutes of my time for rebuttal. This lawsuit challenges a determination by Secretary Chertoff to credit diplomatic assurances that we were able to obtain. Those assurances were obtained by our Undersecretary of State, transmitted to the State Department where they were vetted by our Egypt experts and by our specialists in human rights, deemed reliable, and then transmitted to Secretary Chertoff who agreed with the State Department's assessment and concluded that the assurances were sufficiently reliable to permit the removal of Mr. Khouzam to Egypt consistent with our responsibilities under the CAT. Why is it not a fundamental problem with the executive essentially overturning or deciding on its own that what something has previously been decided by a court is no longer to be adhered to? Well I think there are two issues on that point Judge Rendell. The first is of course there's a question of jurisdiction so that in other words there would be a problem with the district court and the posture of a habeas petition second-guessing the executive's determination when there is no statutory or other basis for jurisdiction. Let's start with jurisdiction. You've said that habeas does not lie. But did not Real ID leave out the concept of detention as being subject to habeas? And is that not what we have here? The detention of this man pursuant to an executive order? So why does not habeas corpus lie with respect to this specific habeas corpus? Well for one thing he's not challenging his detention. He's challenging what he characterizes as an unlawful transfer or removal to Egypt. The second reason is that I think... But he is in detention and habeas has been, I mean he was detained. I grant you that Your Honor. He's currently released. I grant you that. But of course I think the heart of this lawsuit is the challenge to Mr. Chertoff's decision to credit the assurances. The other reason, Your Honor, why there is no jurisdiction under Real ID is that the relevant provision is INA 242A4. And that provision specifically bars district courts from... It explicitly carves out or explicitly refers to and says it includes 2241, right? That's exactly right, Judge Smith. I would also point out... But it says a cause or claim under CAC. Yes. Do we have any courts that have construed exactly what that means? Because technically his habeas corpus petition said, number one, the executive is revoking what the judiciary determined. And number two, I have been denied due process by virtue of this secretive diplomatic assurance procedure. Now, he already pursued his petition for review for his cause or claim under CAC. And that resulted in the Second Circuit and then back. I mean, that already happened. Now he's making a claim that is somewhat different. Is he not? As I understand it, Mr. Cusack has asserted a claim under CAC and that his contention is that his removal is prohibited by CAC, by FARA, by the implementing regulations. So, in other words, if you take CAC away from this claim, I don't know what would remain. This is a CAC claim. Well, except it's the methodology under the FARA regs that is not technically a convention against torture. The regs that were adopted after FARA are not part of the convention against torture, are they? Well, certainly they're part of the convention against torture to the extent that Congress specifically mandated the executive to promulgate regulations to implement the United States would comply with its CAC obligations. So, I do think it's fairly fair to characterize the regs as part of CAC. At least they certainly implement, pursuant to congressional directive, our responsibilities under CAC. What aspect of FARA anticipated the executive being able to short circuit, if you will, any kind of agency or judicial proceeding? I think Congress was well aware when it precluded habeas jurisdiction of the existence of assurances. The timeline on this, I think, is highly relevant. What happened was FARA was enacted in 1998. In 1999, Attorney General Reno promulgated the regulations that are issued in this case, the ones that set forth assurances. Subsequent to that, this court in Odumbinka said, because Congress did not use the magic words, specifically referencing, as Judge Smith noted, the habeas statute, this court said, we are not going to construe FARA as divesting courts of habeas jurisdiction because Congress didn't use the magic words. In 2005, after that decision and after assurances had been the subject of a published decision in the 11th Circuit, Congress came back and said, okay, we are going to use the magic words. And they enshrined those magic words in 242A4. Mr. Dupree, in this case, before the district court, the district court ruled against the government and found that there was jurisdiction to entertain the writ. In light of the Supreme Court's decision in Boumediene v. Bush, don't you have a very uphill battle on the jurisdictional question that there is not jurisdiction under writ of habeas corpus under circumstances such as this? Oh, not at all, Judge Smith. If not, tell me why. Well, for a few reasons. For one thing, Boumediene, I think, is plainly distinguishable in that in that case, you had individuals who were challenging their detention. What is being challenged here is a purportedly unlawful transfer. And so I think the Supreme Court authority that is most on point is the Munaf case. That case, too, concerned a situation where individuals, in that case, U.S. citizens, I might note, contended that were the United States to transfer them to Iraqi authorities, they would be subjected to torture. And the Supreme Court That case is very distinguishable. Also, during wartime I don't think that the principles that the Supreme Court articulated in the second half of that decision were specifically referenced diplomatic assurances and went on to say that those types of determinations are properly made by the executive and should not be subject to judicial second-guessing. I think that portion of the opinion is directly relevant to this case. Munaf was also unanimous. The petitioner was not in the United States. The petitioner was another sovereignty within Iraq. That's right, Judge Rendell. Both this case and Munaf involved crimes that were committed in a sovereign territory. And Boumediene and others were at Guantanamo. But yet, the Supreme Court found that five members of the Supreme Court found that they were entitled to come into the district court to adjudicate their claims on detention. But, Judge Fischer, even if Your Honor were to construe Boumediene as providing habeas jurisdiction, it still doesn't go to the question of justiciability, which is the issue that was in Munaf. Recall that in Munaf, the Supreme Court said, we think there is habeas jurisdiction. Nonetheless, this is not a proper case for a court to actually grant habeas relief for precisely the justiciability concerns I mentioned. So even if this court were to conclude that Boumediene authorized habeas jurisdiction, which I think is directly contrary to the plain language of what Congress intended, but if this court were to say Boumediene provides habeas jurisdiction, then we switch to the Munaf analysis, which is to say, do justiciability concerns preclude a grant of habeas in this context? And the answer to that is unquestionably yes. What's your best justiciability argument? Our best justiciability argument is the one set forth in Munaf, that diplomatic assurances necessitate an analysis of the reliability of a promise from a foreign sovereign. That is a determination that under our Constitution and under the statute is properly made by the executive. But it's stated in the letter that bolster these assurances, supposedly, that they were made after consulting Egyptian experts and experts on international law. And, you know, there is a record here that's similar to a situation when you – there are changed country conditions. Courts can examine the underlying facts and, you know, why shouldn't this be open and have the petitioner be able to counter that and challenge that? Aren't there fundamental due process problems that really, under Matthews, really counterweigh any justiciability argument? Judge Rundell, I disagree with that. I think that the reason why diplomatic assurances are different than an ordinary TAP analysis, that an immigration judge or this court, for that matter, might conduct, is that diplomatic assurances reflect a personal commitment from a foreign sovereign. And the question in evaluating their reliability is, is this a reliable, trustworthy – Personal commitment? A personal commitment from a sovereign? Is that really what we have here? It's a commitment on behalf – submitted on behalf of the Egyptian government concerning Mr. Khuzdam's treatment in order to remove him. Do we really need to look behind that personal commitment and see how well personal commitments are kept in the past? Do we not? Absolutely not, Judge Rundell. I think that certainly the Supreme Court in Munaf said these types of analyses, and I will quote the language just so Your Honor knows that I'm not overstating Munaf. The Supreme Court specifically referenced, and this is on page 19 of the Westlaw version, where they noted the government's argument in Munaf that the decision in that case was insulated from judicial review based on the executive's assessment of the foreign country's legal system and the executive's ability to obtain foreign assurances it considers reliable. And the Supreme Court went on to say, and this is a statement that commanded all nine justices on the Supreme Court, the judiciary is not suited to second-guess such determinations, determinations that would require federal courts to pass judgment on foreign justice systems and undermine the government's ability to speak with one voice in this area. I think that language is directly applicable to what the petitioner is asking this court to do in this case. Mr. Dupree, perhaps I am engaging in an artificial intellectual exercise here, but I have at least tried in my own analysis of this case to separate, at least at the outset, the issue of jurisdiction from the issue of justiciability. And as has been noted through your argument and through questions, the district court found that there was habeas jurisdiction here. It seemed to me that the district court relied to a great extent in that determination on some legislative history, specifically I think the conference report, which seemed to be somewhat at odds with the plain language of the statute. Would you agree with that? Absolutely, Judge. All right. Let us assume for a moment that Real ID's addition of 242A4 does eliminate habeas jurisdiction, which I understand is your position. I assume you would also agree that we are constrained, in fact, we are duty-bound to attempt to avoid a suspension clause problem here. Correct? Typically the way courts approach it is that they can avoid a suspension clause problem through a reasonable reading of the statute. The Supreme Court teaches us that. That's what St. Cyr says. Yes, that's what St. Cyr says. So why could we not treat the termination of deferral of removal as the functional equivalent of a new petition for review? Why would that not have more fidelity to the language of the statute and at the same time be avoiding the suspension clause problems that we are counseled and instructed by the Supreme Court to avoid? Two reasons, Judge Smith. The first is that construing this challenge as a challenge to a final removal order avoids the fact that Mr. Kuzan is not challenging a final removal order. The final removal order in this case was entered by the Board in 2002, and in fact he admits that there's no challenge to removability. The only thing that he is contesting is Secretary Chertoff's decision to terminate his TAP deferral as to Egypt. He is not challenging the final removal order, and he admits this in his brief. Well, he already did. He already did challenge his final removal order. He did. And he filed a petition for review. Yes. I agree with that point, Judge Rendell. But regardless, the point is the same. He's not challenging a final removal order by his own admission. The second point, which I don't think this Court need reach, but even if it chose to construe it in that way, which I think would be contratextual, the second reason is that a petition for review must be filed in the jurisdiction in which the removal order was entered, which in this case would vest the Second Circuit with jurisdiction. We don't think it does. We've pretty much shot that down in Baltimore, haven't we? I don't know about that, Judge Smith. I think that, again, if one were to construe this as a final removal order, I think that one of two things would have to happen. Either the Second Circuit would be vested with jurisdiction or the D.C. Circuit would be vested with jurisdiction if jurisdiction were predicated on Secretary Chertoff's determination, which occurred in the District of Columbia. Again, we don't think there's jurisdiction in any of those courts, but I'm saying that even if this Court were somehow to construe the PFR, this is a PFR, I think that would be the outcome. I don't see any circumstance in this Court. There haven't been many terminations of deferral of removal. That's correct, Judge Fischer. How does, and perhaps you could explain for me, for the panel, how does deferral of removal differ from withholding of removal? And does that have any significance on the termination issue? It does, Judge Fischer. Deferral of removal is a remedy that is granted pretty much to the most serious of criminals. It applies to or it's available to terrorists, persecutors, and serious criminals. In other words, those individuals who would not be eligible for asylum, would not be eligible for withholding of removal, and would not be eligible for TAT withholding of removal. The reason why this is significant is because, in many cases, termination of TAT protection pursuant to assurances is the only way that we would have to remove individuals from this country. In other words, these are individuals who have either committed acts of terrorism, serious crimes, or persecution, and Congress in FARA specifically directed the executive to develop procedures that would facilitate to the maximum extent within the permissible limits of our TAT obligations, these individuals. So this does apply to a very narrow segment of individuals, and this is not something that we or any administration, for that matter, has used with great frequency. But diplomatic assurances are not limited to these particular persons, are they? Well, they apply in the context of deferral of removal as distinct from withholding of removal. Yes, Your Honor. But there is process for these types of individuals that set forth in the regulations of 208.17d that calls for the full panoply of protections. To terminate deferral of removal, there is procedure that is followed with the IJ and the BIA, and, in fact, review at the circuit level. Second Circuit, in the Ali case that was just handed down, just did that. Why is that not the appropriate way to go, even with diplomatic assurances? Let it be tested. If you're going to terminate a deferral of removal based upon the executive's say-so, why should there not be the process for have it mandated as set forth in 208.17d? Am I incorrect in that? Well, first of all, the regulations distinguish between the situation that obtained in the Conrad Ali case and the termination of cap protection pursuant to assurances. Excuse me. The reason why cap protection termination pursuant to assurances is different goes to the justiciability issue. In other words, that the executive has decided that this is not an appropriate inquiry for an immigration judge or for a court to make. This is a determination that is made by two very high levels within the U.S. government, the Secretary of State and the Secretary of the Department of Homeland Security. And so that was the procedure that the executive set forth, that in this narrow class of cases involving terrorists or other serious criminals, this is the procedure for terminating cap protection pursuant to assurances. But don't we have a repeated Supreme Court authority, not just Boumediene, but Zadvidas, where the court said that it suggested that the Constitution may preclude granting an administrative body the unreviewable authority to make determinations implicating fundamental rights. Don't we have, and Hamdi, don't we have repeated Supreme Court statements that say there needs to be some review of this type of case where we have a freedom from torture issue that is so fundamental? I don't think Zadvidas can properly be read that way, Judge Rendell. Zadvidas, of course, was a challenge to detention. And in Boumediene and also Munoz, the Supreme Court emphasized that challenges to detention are what fall within the core of habeas. So no one is disputing that if we were, say, to detain an alien beyond the prescribed length in Zadvidas and there's no immigration-related purpose, that yes, there would be a right for release at some point. But again, this is not a challenge to detention. But Munoz became pursuant to the fact that he was going to be removed, and it was pursuant to the executives taking him in to, in fact, carry out the executives' determinations. So was it not appropriate at the time for him? Didn't habeas fit with the fact that he'd been taken in? Well, habeas might fit to the extent he was challenging his detention. In other words, to the extent he was arguing, I'm not dangerous, I'm not a flight risk, therefore I may not be detained. But I shouldn't be detained because a court has decided that I'm entitled to deferral of removal and it's not appropriate for the executive to say that that's no longer the case, isn't that? But a challenge to detention is distinct from the merits of what Mr. Kuzan was arguing before this court. In other words, he's not saying, well, I should be detained or shouldn't be detained pending my removal. What he is arguing is that Secretary Chertoff's decision violates his rights. Well, I mean, the whole idea in Hamdi was that they had set on an enemy combatant, and it was that determination by the agency that led to his being detained, and that's the very determination that's being challenged, just like the determination here that I'm no longer going to be tortured. But these detention cases didn't involve the diplomatic assurance, which I think, as Munaf makes abundantly clear, is distinct from an ordinary challenge to detention. There's no question that the core of habeas involves challenges to detention, but we're dealing with something entirely different here. We're dealing with the United States assessment of the trustworthiness of a promise of a foreign sovereign. The Supreme Court said exceedingly clearly in Munaf that that's not something that's susceptible to judicial review. This case tests, obviously, the scope of executive power in circumstances such as this. But why, similar to what Judge Mandela would ask you, why in this exact case, why would it not have been sufficient to have gone before the immigration judge and presented the assurances that you had from the Egyptian government and let the IJ and let the immigration process run its course to make a determination of whether those assurances were adequate to send this gentleman back to Egypt? Why wouldn't that be sufficient? Well, simply because the IJ is not well-positioned. Certainly, that's not the procedure contemplated by the regulations, but as far as the underlying policy… What are the procedures in the regulations, then? The procedures in the regulations provide that as soon as we submit assurances that the IJ is divested of jurisdiction. But the underlying policy choice here, Judge Fisher, simply reflects the fact that the executive in promulgating the regulations under FARA determined that this is not something that should be second-guessed or reviewed by an immigration judge. What is this? This is something that shouldn't be. What is this that would be reviewed by an immigration judge? The determination whether the foreign sovereign's promise is sufficiently reliable and trustworthy to permit the removal of the individual consistent with our responsibilities under the cap. I understand, but it seems to me that we have two possible routes here. One, of course, would be to sustain your position and say this is simply not justiciable and there should be no review of any kind of these diplomatic assurances. The other would be to go the other way but to determine how far, and that would be to apply some rule of deference. I am sure that you would oppose what has been suggested here in both the red brief in response to your brief and that appeal as well as some of the amici, that there be some kind of de novo review by any court, including this court, as to reliability of diplomatic assurances. Clearly, if we were to determine that there ought to be some form of review, how far should that review go? Just what should a court be looking to to determine whether or not diplomatic assurances have some reliability? Well, beginning with Your Honor's premise that if the court were to decide that there must be some form of review, I think an appropriate standard would be the standard set forth in Kleindienst v. Mandel, which of course is the Supreme Court decision that enacted or enshrined the facially legitimate and bona fide standard. So should it be nothing more than review by this court of whether or not you have followed your own procedures? Yes. Because that is by you, I mean both state and Homeland Security. Exactly. If this court determines that state obtained the assurance, which the record plainly reflects it did in this case, and transmitted it and consulted with Homeland Security, which again the record reflects occurred in this case, that would be the end of this court's inquiry. Again, all assuming that this court believes that it can evaluate the issue, which of course we don't. The district court did not spend much time in a Baker v. Carr analysis here. I think there may have been analysis of one Baker v. Carr factor. But should we be looking at this question of judiciability, justiciability first of all through the lens of the Baker v. Carr factors? Yes, Judge Smith. The reason I've been citing Moonoff is because I think obviously it's a unanimous Supreme Court decision that is fairly on point. But, yes, I think that the analysis set forth in Baker v. Carr is applied, of course, by this court in Gross v. German Foundation. It sets forth, as Your Honor knows, six factors, any one of which indicates the existence of a political question. And I would point out that this court's application of the political question doctrine without question I think compels a result in the favor of the government in this case. For example, in the Gross case, the court noted that the executive had not asserted any particular interest that would be violated were the court to adjudicate the case before. Of course, in this case, we have evidence in the record, including a declaration for a Deputy Assistant Secretary of State, explaining the diplomatic implications of judicial review. I think that in the Gross case there were five other factors that the court marched through. In that case, of course, it did not find there to be a political question. But I don't think there's any possible way that this court could analyze this case in light of those six Gross factors and rule in favor of Mr. Kuznam in this case. This is a political question. Let me go back to your argument vis-a-vis Kleindienst and the spatially legitimate and bona fide reason. I mean, Kleindienst was a situation where discretionary action was at the heart of the claim. Here we have the standard is more likely than not that he will be tortured. Do we not have to – would a court not have to examine the conditions that were present when the deferral was granted, where it was deemed likely that he would be tortured and put up against them the current conditions, test the experts, really make that determination that is required under FARA, that is this man more likely than not to be tortured? Don't we really have to have a court looking at that as compared to having to say that the government's reasons are facially legitimate? Isn't our obligation under TAT something that is very meaningful, that needs to be adhered to as compared to the executive say-so that we really should rely upon what Egypt says? Well, first of all, Judge Rodelli, I agree 100% with Your Honor that we need to be serious about our obligations under TAT, no question on that issue. I think the question is, of course, what are our obligations under TAT and how has Congress implemented the TAT? And I think Congress has spoken exceedingly clearly that there is no judicial review in district court under habeas for TAT claims. Well, my point is that the facially legitimate standard really doesn't satisfy TAT, does it? Well, of course, our position is that any judicial review is inconsistent with review of this type of TAT claim. So I begin with that premise, Your Honor. I think that the facially legitimate certainly is not what we would advocate, but addressing Judge Smith's situation, or if the court determines some review is appropriate, I think that's exactly it. I would also note that Kleindienst was not a case where it was a discretionary determination at issue. I think in that case what the Supreme Court said provided the jurisdictional predicate was the existence of a waiver statute in which Congress had specified certain conditions. And that was the jurisdictional trigger for the court to conduct its facially legitimate review. But I think the Supreme Court subsequent to Kleindienst has been abundantly clear that this is an area that is constitutionally committed to the executive and the legislature's discretion. But it's also an area where there are procedural due process implications of notice of the claim, opportunity to be heard, notice of exactly what the proceedings are, and none of this has happened. So procedural due process is implicated in a way here that hasn't been implicated in other cases. Well, I think that that in turn raises the question of what precisely is the constitutional interest at any, if any, at stake here. And certainly this court in the Camara decision squarely rejected the notion that there is a substantive due process right against third-party harm. That was with respect to the state-created danger theory. Right, exactly. It said there's absolutely no place for a state-created danger theory in our immigration jurisprudence. Substantive. That's right. That's right. But, of course, I think in order to trigger the protections of procedural due process, there needs to be an underlying interest, an underlying substantive constitutionally protected interest. And certainly I don't think the plaintiff can point to any in this case. I see my red light has been on, and I would like to reserve my four minutes for rebuttal if possible. Thank you. Thank you. Good morning, Your Honors. May it please the Court. Lee Gelernt on behalf of Petitioner Appellee. With the Court's permission, we will be splitting our time today. I will be addressing just the jurisdiction. We have split our time along the analytical framework Judge Smith suggested, where there's the threshold question of jurisdiction, and then my colleague will be addressing judiciability and the merits. Let me pick up on the points that Judge Smith and Judge Fisher were both making, and that is that on the constitutional question, we believe it would be extraordinary, particularly now in light of Boumediene, but even before Boumediene in light of St. Cyr, to have absolutely no judicial review whatsoever where an individual's liberty is at stake. There has never been a time in the history of this country where someone's liberty could be deprived, including a noncitizen, without judicial review. We believe, again, especially in light of Boumediene, that the suspension clause would absolutely be violated if there was judicial review whatsoever, which is the government's position. And that brings us to the point that Judge Smith was making is, well, how can we avoid that constitutional question? Is there a way to do so? We believe there are two ways to do so. And, again, the fundamental point is that there be judicial review, not necessarily where it takes place. But we do believe there are two ways. One is to construe the statute to allow for habeas review, which I'll elaborate on. The other, I think, is if there is no habeas review, there is no reason why this court needs to play a semantics game with the government and refuse to treat the diplomatic assurance of the functional equivalent of a final order of removal and allow petition for review in this unique circumstance. And, again, I would stress about that point, if you do go to petition for review route, the only time you're really going to have to do this functional equivalent move is this case. Because afterward, if you were then to say an IJ and BIA do need to look at these as a first instance, make the normal fact findings, like they do in a changed circumstance condition, then it would come up in the normal process, IJ, BIA, straight to this court, as this panel is obviously familiar with, in the normal immigration situation. So it would be a one-time situation. And we do feel that it would be extremely unfair to have Mr. Kazam do the normal route, go to the Second Circuit, the Second Circuit say he will be tortured, he did everything he could with a final order of removal. Then after that process is over, the government then, at that point, uses diplomatic assurance and say, well, your final order is over. Having said all that, we do think that a proper reading, and I think I do believe that the best reading of the statute, is to find habeas. Because this is a unique situation in which this is a post-order event. And I want to speak directly to Judge Smith's concern about the language of A4 and whether it's inconsistent with the legislative history. This court, in a number of decisions which we've cited in our briefs since Real ID, has relied on that legislative history, I think, because it's unique in that it's a joint House-Senate conference report. And what it said is, where you are not able, where the government will not let you bring a petition for review because they're claiming you're not actually challenging the final order, as that term is traditionally understood. Of course, the obvious question is, if it was so easy to place into a conference report, why not place it in the text of the statute? Your Honor, I think that, I mean, one answer I do believe is that the statute is not all that precisely drawn. And if you look at a number of places, there are redundancies everywhere overlapping inconsistencies. But the one thing this court has said is, if there's not a final order and the challenge is independent of a final order, which the government is insisting this is, then habeas remains. And those final order cases, post-final order cases, have come about in a number of different situations. And each time this court... And what does A4 mean? It says a cause or claim under PAT. It specifically addresses the situation. So what does it mean? Well, absolutely, Your Honor. And so let me be as precise as I can. And I think what it means has to be understood against the background. Prior, as this court is aware, prior to the Real ID, many people with CAT claims would have been barred from going to the Court of Appeals. They would have had to bring their CAT claims in habeas, people who were subject to a criminal conviction. And what I think Congress was trying to do is absolutely ensure that there would be no mistake that everyone, including people alleging CAT claims, could now go to the Court of Appeals by petition for review, notwithstanding those jurisdictional bars. And if you look at the specific piece of legislative history in the case of CAT claims, it says individuals in 240 proceedings, which is a removal of proceedings, will now be able to obtain judicial review by petition for review. But it doesn't talk about these unique situations. And I think one of the overriding things, which this court has stressed over and over about Real ID is, and it says it explicitly in the conference report, is it was not intended to eliminate review, but simply channel review from the habeas courts to the Courts of Appeals where review was possible in the Courts of Appeals by the normal petition for review. Clearly, or not clearly, I think you'll agree that the CAT was not self-executing. Yes, sir, and we're proceeding on that assumption. The CAT was not self-executing. And prior to FARA, under circumstances such as this, there was no way to review in the courts this kind of decision. Okay, do we agree with that? Actually, Your Honor, respectfully, I would not. There was not habeas jurisdiction prior to FARA. Let me just make this point, because I think you're raising a very important question, one this court dealt with in Albuquerque, but I think one that the government has, you know, is permeated throughout the government's briefs. And that's the difference between a jurisdictional grant and substantive rights to enforce. Now, prior to FARA, this court held that CAT was not self-executing and there were no rights to enforce. But the habeas statute always remains and has remained there since 1789 and was not repealed. So what the petitioner could have done is walked into district court, filed a habeas petition, and the district court would have said, I have 2241 jurisdiction, but would not have had any rights to enforce. Even if I agree with you on that, FARA is enacted, and in FARA, they said, except for review of final orders of removal, no court shall have jurisdiction. Correct? They said no court shall have jurisdiction to challenge claims, challenging regulations, and other claims shall be brought by petition for review. FARA says no jurisdiction in the courts. They give, in FARA, the executive branch the right to adopt regulations. Correct? And the executive branch determines in their regulations that in circumstances such as this, that if they get appropriate diplomatic assurances in a deferral removal case, that they can make the determination to send that person to terminate, in effect, the deferral. That's all they're really doing here. Because Kasum did not challenge the removal. Kasum, in the Second Circuit, asked for deferral removal, asked for withholding removal, got deferral removal. Okay? But the executive branch, post-FARA, adopted regulations, and says we're going to make this determination. All right? Come to the Real ID Act. Whether Congress was specifically aware of it or not, and I assume that Congress had some awareness of the existence of the regulations, Congress limits, under the Real ID Act, how you can come to this court. And in this case, Kasum went to the Second Circuit, had his day in court, got deferral removal. And doesn't this all boil down to the fact that Congress has said, in determining whether the assurance is appropriate, that we would rather have the executive branch make this decision rather than the judicial branch. Isn't that what this case really boils down to? Your Honor, I do believe that there is a difference between the judiciability points and the jurisdictional points. And you're raising the points about the regulations, and I realize you're raising it in combination with others, but I do not believe that what... This gets back, and not to interrupt your answer, this really gets back to the jurisdictional question, and could weave itself into the justiciability question. That's why I'm surprised you divided it that way. But go ahead. Well, Your Honor, I think, you know, let me start from my baseline, is that we do not believe there would be any way for this court to uphold this scheme with zero judicial review in any court by any means under the suspension clause. We believe that was clear after St. Cyr. It is absolutely clear after Boumediene. I mean, Boumediene is an a fortiori case for us in the sense that we're dealing with people alleged to be enemy combatants held at Guantanamo. I mean, this case is more like St. Cyr. So we do not believe... I think that's the one thing that Boumediene made absolutely clear. You cannot have no judicial review. You can get to the deference point, as Judge Smith pointed out. There will be judiciability points. There will be merits issues. But to say that someone's liberty is going to be taken away without any court whatsoever reviewing it under any standard we believe would be unconstitutional. Is it liberty? Is it detention? Do we have to frame it as detention? Or would you say that freedom from torture is on the same level? Well, Your Honor, I think you're asking a good question, and then I want to return to your question about the regulations. I don't think that you need to frame it as a question of detention per se because I don't think that's what St. Cyr was about. The one thing that St. Cyr did is trace the history of habeas corpus throughout this country and even back further. And what it said is that removing someone from this country, and then especially if it's torture, implicates a suspension clause. So I think both detention per se but also the removal of an individual against his will implicates a suspension clause. So I do think you do not have to say this is detention. It's implicit. Your Honor, back to your question. So that's our baseline. So given that, we do believe, though, that it is possible to construe the statute. FARA, this Court has already construed in Okapedinka and said, absolutely, we understand that Congress may have wanted to hold reservations back, but we do not think, given the clear statement rule in the suspension clause, that FARA Section 2242D repealed habeas. And the Court was very clear about that and rejected each and every one of the government's arguments, including the fact that the cat was not self-executing. So then you come to Real ID, and the question is, has Congress been that specific as to diplomatic assurances? Could you potentially weave out an inference that Congress was aware of these obscure regulations that had been used at one time that had been addressed by only one court? In a footnote, that's the 11th Circuit of Solomonia. That's possible. But what I think the Supreme Court is teaching us is before you reach a suspension clause issue, you have to be unequivocally sure that Congress intended to address those suspension clause issues. And I think the opposite is actually clear about the Real ID Act in that Congress went out of its way to repeatedly cite St. Cyr in the suspension clause prompt that would occur if there's no review whatsoever, and I think made clear that it was not looking to bring those suspension clause questions on. So whether this court wants to hold that 2241 still is available, based on its court cases holding the post-removal order issues can still be reviewed, or whether it wants to put a petition for review, I do think this court can stop short of having to strike the statute down. But I see no way that this court could uphold the statutory scheme where there is absolutely no judicial review whatsoever. To carry this out a further step, if you say that there is habeas jurisdiction to essentially challenge this adequacy of the assurances, and it's reviewed by a court, then the court says deport them on July 25th. Is there habeas jurisdiction a third time to come in here and say, I shouldn't be sent out on July 20th? When does this stop? Your Honor, that's a good question. When does it not become a final order of removal? Right, that's a very good question. Let me be very clear about it. At this point, when he got the diplomatic assurance, he had had no judicial review of the diplomatic assurance. So I think for the government to say he had review in the Second Circuit, well, that's true, but he won the diplomatic assurance court after. So I think he would now, if you send it back, whether you send it back to a habeas court or the immigration judge, I think that would be the final round. And so if he won below, the government would have the right to appeal to this court, and if he lost below, he would have the right to appeal to this court. But we're talking about one round to test the diplomatic assurance. I want to be 100% clear about this. We are absolutely not talking about multiple rounds of judicial review. We are here today seeking one bite at the apple in court of the diplomatic assurance, which he has never had. Does the suitability of the type of court proceeding dictate which of the two avenues we should follow if we were to do that? In other words, habeas, if it went to Judge Van Aske who isn't used to handling immigration matters, whereas if we would treat the termination of deferral as an agency action, that would be the final order of removal and follow a petition for review process, which is, in fact, anticipated under the regs. Under 208.17d and the Ali case, there is that. The only exception to that is this diplomatic assurance. So Congress has already – Right, in which many ways it's even more necessary with the diplomatic assurance. That's a very important question, Your Honor. We believe that if it went back to Judge Van Aske, he would have to have the power to do fact-finding because there's been no prior tribunal that's done fact-finding, and that's what Justice Kennedy said in Boumediene. There doesn't need to be fact-finding by the habeas court necessarily if there's prior – There hasn't been here. Right. So shouldn't this be sent to an IJ? Well, right, so if it's sent to an IJ, the IJ would have to have the power to do findings of fact, and the government could not walk in before the immigration judge and truncate that proceeding. They would have to do fact-finding. Well, and wouldn't it be like the 208 where there's a change of circumstances? It's exactly what the deferral can be terminated for change of circumstances through this process, and that would be the – as long as the immigration judge could do fact-finding, that would be constitutionally proper. If the government were not going to allow the immigration judges to engage in fact-finding, then I think habeas would be the appropriate – I see my time is up. Unless there's other questions, I'll turn it over to my colleague. Thank you. Thank you. Thank you. May it please the Court, I'm Rit Singh on behalf of appellee petitioner Sami Khazam. I will address the justiciability and merits issues. I would like to emphasize a few points before I pick up on specific comments raised by each of you. First and foremost, the government's position and the extremity of the government's position should give this Court pause. The Second Circuit, in upholding my client's grant of deferral of removal, specifically found that, quote, the provisions of the Convention Against Torture have been shamefully trampled upon by the Egyptian police, unquote. And the government does not dispute that finding. It does not dispute the decades' worth of State Department reports that further corroborate that finding. Instead, it says that it is entitled to use diplomatic assurances because that essentially compensates for all of that record. But, Your Honor, it's important to note, nor does the government dispute that Egypt has actually violated diplomatic assurances in the past. It does not dispute that Egypt denies independent monitors access to its prisoners. And it does not dispute that my client is particularly vulnerable to torture on account of his being a Christian, on account of the fact that he was tortured in the past, including being sodomized by a hose and numerous other savage beatings. All of those undisputed facts are part of the record here. The government does not dispute them, notwithstanding those facts. They are now asking you to look the other way while they turn my client over to Egypt based on an unreviewable diplomatic assurance. Your Honor, that extreme opposition just cannot be the law. With respect to the government's points about justiciability and the concerns of the court, the government claims that the issues here are beyond the competence of the court, but that simply cannot be true. There is an objective legal standard here, the more likely than not standard, and U.S. courts have applied that standard in Convention Against Torture cases consistently. There's no reason why that standard cannot be applied here. It's available for application. With respect to the government's argument that there are issues in these assurances that are specifically within the competence of the executive branch, leaving aside the good faith of Egypt, leaving aside the intent of the Egyptian and the United States government in entering these assurances, there are other factors, such as whether a monitoring mechanism even exists in this case, that are relevant, that are very similar to the routine kinds of questions that courts address in routine TAP cases. It is notable that the government hasn't even mentioned that a monitoring mechanism exists in this case, let alone provide any description of what that monitoring mechanism is. If on top of everything else that state had represented and rendered on to Homeland Security, there had been a representation that monitoring was available in some form and would be pursued, would that satisfy you with these political assurances? Well, it would really depend on what the affidavit said, Your Honor. It would depend on the level of detail. It's not enough for the government just to say that there is some monitoring mechanism. Well, they haven't said that at all here. Right, that's correct. It's not enough for them to say that even if they said there is some monitoring mechanism, it's not enough for them to just say that they need to show that it's an independent monitoring mechanism. There's a record here. Our special position is that there is enough in this record for you to raise very serious questions about whether Egypt could possibly provide sufficiently reliable assurances. But even if you were to accept in principle that Egypt was capable of enforcing these assurances, you would still need to ask whether the procedure has been followed here that is satisfactory and whether there is a monitoring mechanism in place that will ensure that the promise will actually be implemented. And I would draw the Court's attention to numerous other courts, foreign courts, courts of other countries that have actually specifically addressed that monitoring issue. For example, the European Court of Human Rights decision, Riyadh versus Russia, which we cited in our 2018 letter, the Court specifically questioned the value of assurances in light of the fact that Turkmenistan did not allow independent monitors access to its prisoners. And that's exactly the same situation here. The government hasn't rebutted our factual claims in the affidavit of Julia Hall that state unequivocally that independent monitors, international monitors, are consistently denied access to prisoners in Egypt. So the government has a heavy burden here, and it has not met that burden to show that Egypt can actually comply with its assurances. Well, the point is we don't know. For all we know, the executive has looked into monitoring, but we just don't know. It's a secretive process. Isn't that the problem? We don't know what people have said to the government. There's no way to counter it. Certainly, Your Honor. That is a serious problem. My client and this Court have not been given any information with which to determine whether the requirements have been met under the statute. There are serious constitutional due process problems at issue here. Notice has not been given to my client. He has not been given a meaningful opportunity to be heard before an impartial adjudicator. Under these circumstances, the assurances must surely be set aside. How does an Article III court examine the reliability of diplomatic assurances without really intruding into the very sensitive area of diplomacy, which is, of course, uniquely executive branch function and a specialized executive branch function? Judge Smith, I'm very glad you asked me that question because I understand that this is something that the Court is grappling with. I think that this Court has made clear that merely because a question touches on foreign relations does not necessarily mean it will be immune from judicial review. And all the way back to Baker v. Carr, the Supreme Court has said that. Certainly, Your Honor. And to add to that, the fact is that there is a statute here. Congress has enacted the Foreign Affairs Reform and Restructuring Act. Even the regular PAT claim that did not raise a diplomatic assurance surely had implications for foreign relations. Nonetheless, Congress enacted the Foreign Affairs Reform and Restructuring Act. Even the government doesn't dispute that this is a mandatory obligation. Well, I understand that. But this goes back to the question that I asked earlier with reference to deference. Assume that we determined that some form of review of diplomatic assurances is appropriate, that the question is justiciable. What form should that review take? What standard should be applied? Are we, as an Article III Court, to apply some de novo standard and engage in credibility determinations of the same kind and character as our diplomats have engaged in in determining that there is reliability to these assurances? Do we have the competence to do that? That's a very, very important question. The question of whether or not Egypt has provided sufficiently reliable diplomatic assurances is a legal question and, as such, must be subjected to de novo review. The question of deference, Your Honor, although subjecting it to de novo review does not necessarily mean that you will not accord any deference to the author David. If we did go the route, just assuming we went the route of petition for review as a basis for jurisdiction here, we should permit any IJ in the system to engage in de novo review and make determinations on reliability of diplomatic assurances, just as the government contends were high-ranking government officials, high-ranking executive branch, State Department officials made in this case? Your Honor, let me just be clear about what I'm stating. I think I'm not making as broad a claim as you're suggesting. I'm trying to determine that because you indicated de novo review, and I'm trying to determine what the implications of this are. De novo review of legal claims, but that could encompass within it a certain amount of deference to the factual assertions made by the government. So we're not disputing that every single affidavit must be second-guessed by the courts. The ultimate question is a legal question. I'm sorry. When you say affidavits, what affidavits are you referring to? Any affidavits or testimonies that the government might provide, I think. There certainly is room within a de novo standard to accord some deference to the affidavits or the factual claims of the government. But nonetheless, the requirements of due process are such that that review must be searching. Your Honor, let me just go back to one of the questions that came up while my colleague was talking. You mentioned Kleindienst v. Mandel and what the standard would be to apply. I would, again, draw your attention to Humvee because in Humvee the court specifically rejected the some evidence standard for review of the an adversarial fact-finding process below. And so especially when there has been a complete lack of factual development, there's been a complete lack of adversarial proceeding below, it is incumbent upon the court to take on more than perhaps it would be required to take on had there been a fuller exposition of the record. Are you arguing that the whole diplomatic assurance aspect of the regulations is of no effect as beyond the contemplation of FARA? Or are you saying that within the context of these diplomatic assurances, nonetheless, there then is review of the assurances? Your Honor, the latter. And I would draw your attention to ACFR 208.18, which specifically in setting up the regulations regarding diplomatic assurances, say that there won't be any IJ or BIA review. But at no point do they say there won't be any federal court review. So at least one other way of going towards habeas here would be if you wanted to preserve the regulations as they are, to say, okay, even if there is an IJ, BIA review, there should at least be federal court review. But I would also add that we're taking the narrower position here that diplomatic assurances, if they are used, if this court were to reject our claim that IJS assurances should be rejected in light of the particular circumstances in this case, if diplomatic assurances are then used, then they must be subjected to meaningful and independent review. They must be subjected to the requirements of due process. They must be noticed and a meaningful opportunity to be heard. And the de novo aspect is the court must determine de novo whether they're more likely than not that Mr. Kuzan is. And certainly the legal standard is it should be subjected to de novo review. Your Honor, I would also like to draw your attention to the fact that all of the – none of the justiciability cases cited by the government present an issue such as this, which raises such substantial individual liberties concerns. And in fact, what is at issue here is not just my client's life and physical safety, but the life and physical safety of numerous others that the government will try to transfer or remove in the future to countries that are notorious for their use of torture. As I mentioned earlier, Egypt is no ordinary torturer. The Second Circuit specifically held that it shamefully trampled upon the provisions of the Convention Against Torture. Those findings are worth something, Your Honor. The Second Circuit's opinion was very, very strong in that regard. It looked at the record before it and recognized that my client would be detained and interrogated and confessions could be extracted from him and that he was entitled, therefore, to the deferral of removal. Are there no more questions? All right. What weight, if any, should we give in determining – again, assuming that the diplomatic assurances are justiciable, in whatever form of review we determined was appropriate, is it not equally appropriate for us to consider, just as you have urged us to consider, the language of the Second Circuit and what we otherwise can divine from the various sources about the dubious recognition of human rights by Egyptian authorities, isn't it also a factor for us to consider the longstanding diplomatic relationship between the United States and Egypt, not to mention the billions of dollars that have been paid by this country to Egypt and a relationship which, by the way, incorporates the funding of such things as judicial development projects in Egypt and the partnership of not only the American government with Egypt but judges within this country and judges in Egypt? Is that not also an appropriate factor for us to consider as we try to determine the level of deference we ought to give the executive branch in how they assess the reliability of these assurances? Well, Your Honor, there is a mandatory statutory provision here that Congress has spoken on unequivocally, and that is when torture is at stake, those concerns should be subsidiary. I think that that is what FARA ultimately means. That's why I was somewhat surprised at your answer about the whole concept of diplomatic assurances. It seems to me to be somewhat, I mean, in a scheme of things, beside the point. If the idea is, is this person more likely than not to be tortured, diplomatic assurances, I mean, they could become the rule. Absolutely, Your Honor. Diplomatic assurances every which way, and to me it would – maybe it fits in to change country conditions, but we've dealt with that procedurally. And I'm glad you – We've dealt with policies, policies of money, and so maybe that goes to a believability, but if the ultimate standard is, is this person going to be tortured, we need to look at a broad scheme of things. Certainly, Your Honor, and I'm glad you asked that question because we have urged – we understand that this court is not prone to making overbroad rulings, and so we have offered a narrow provision. Or if we do, we don't think they're overbroad. Certainly. And so we have offered a fairly narrow possibility for a narrow ruling, but certainly you could make a broader ruling, and there is an amicus brief by the OMCT and Human Rights Watch as well, which set out the authority for you to distrust diplomatic assurances per se, because they are – the government says that they're sought from countries that torture, and in this particular case, there is a country that is notorious for the use of torture. And so the question is, when you know so much about all of the Egypt's record of torture, can you – should you even resort to a diplomatic assurance? Does it make sense? Isn't there something that is fundamentally inconsistent here? Why would we need – and I understand that there actually is an argument in this case that diplomatic assurances should not apply to a country such as Egypt, which has its track record, if you will. But looking at the nature of diplomatic assurances, why would you need it with a country other than a country that raises the kinds of serious questions about human rights that Egypt raises? And isn't that specifically the purpose for a diplomatic assurance? It is something that if in fact promulgated, and the basis of an evaluation that leads to a reliable result, isn't it in fact something that is actually counterintuitive to what one might think if you looked at Egypt and its record more broadly? It's a particularized assessment, as I understand it, and you can correct me and so can the government, that is directed to this case and this individual and a product of some kind of bilateral discussions made between diplomats and taking other factors into account. Those are very important questions, Judge Smith. Let me answer them in two stages. The first part of your question was aren't diplomatic assurances necessary precisely in those cases where countries have a record of torture? The district court also, I believe erroneously, said yes to that question, and let me explain why. The reason is that it may be necessary to get diplomatic assurances even when a country does not have a record of torture. But that's not our case. That's not our case, but you could still want a diplomatic assurance from a country where an individual is likely to be tortured for reasons specific to that individual. Say, for example, in the gang retaliation cases, under those circumstances, a country may not have a record of torture but may still be required to give a diplomatic assurance to protect the individuals from retaliation from gangs against whom he has been an informant. And there are two such cases that are cited in our brief where the country doesn't have a record of torture. So the conclusion that we should draw from your position is that no diplomatic assurance from Egypt in particular or a country with a very similar human rights record should be accorded any efficacy here. Certainly, that is one of the positions we have offered. But if you were not even to want to go that far, we have an even narrower position for you, which is given the circumstances of this case, which includes not just Egypt's record of torture but its prior violations of diplomatic assurances, which have not been disputed by the government, but also my client's particular vulnerabilities in light of him being a Christian, in light of the fact that he was previously sodomized with a hose and beaten savagely, in light of the fact that he is going to be in detention and will potentially be subjected to interrogation. All of these factors go to demonstrate that in this particular case you should set aside these assurances. And if you were not to go even that far, then you must at least set aside these assurances on the grounds that my client has not been provided with the most basic elements of due process here. He has not been given notice. He has not been given a meaningful opportunity to be heard before an independent adjudicator. And, Your Honor, I would just like to point out in that regard that the United States is an outlier among the civilized nations of the world on that particular issue. As set forth in the affidavit of Julia Hall, every single country, including Canada, the United Kingdom, Switzerland, Austria, every single country that uses diplomatic assurances provides some form of judicial review. And so the fact of the United States' outlier status should also give the court pause. Thank you very much. Thank you. Just a few points in rebuttal. The first is this is a case where Secretary Chertoff has publicly stated that these are reliable assurances, as has Undersecretary Burns, exercising, of course, the delegated authority from Secretary Rice. In Munoz, the Supreme Court emphasized that it is important to permit the United States to speak with a single voice in this area. And this is also triggers or implicates the court's concern in Gross, the political question case, where it said that underlying this doctrine is the notion that courts should not publicly contradict statements of our diplomats or make our diplomats seem anything less than authoritative when they're making public determinations in this area. I think that Munoz and Gross both counsel in favor of either no review, or in the event this court decides some sort of review is appropriate, the facially legitimate standard in Kleindienst, which, of course, the Supreme Court has subsequently applied in Fialo and other cases. So I think that is a standard that the Supreme Court, at least, particularly in the immigration context, has repeatedly returned to. The second point, and I think this gets at counsel's discussion of a request for de novo review, what is essentially at issue here is a factual determination, that is to say whether or not the commitment by a foreign sovereign is trustworthy and reliable. That is a determination of fact and, as such, it is not something that historically would have been cognizable on habeas review. In St. Cyr, in fact, the Supreme Court was crystal clear in doing a suspension clause analysis in emphasizing that what is the question, the relevant question, is whether Congress has precluded review over pure questions of law. That was the term that the Supreme Court used in St. Cyr. Of course, here we're dealing with a factual assessment. At most, we're dealing with whether or not a constellation of given facts meets a legal standard, which this court in Jarbaugh has said is a question of fact under our immigration laws. So I think even if this court were inclined to say we need to avoid a suspension clause analysis, I think it could go right to the heart of the issue and say this is not a claim that historically would have been cognizable on habeas, hence there's no suspension clause problem. But in habeas, when we say we don't review factual findings, it is clear that before it had gotten to the habeas court, there had been notice and opportunity for a hearing and actual process in arriving at factual findings. Here, we don't have that. Here we have a secret, silent determination, and so we don't know what facts went into that, do we? Well, at the end of the day, Your Honor, it's a factual determination. I grant you that the underlying evidence, that is to say the assurances themselves, upon which the factual determination was based, I agree that those are not in the record. But again, what we're talking about here is a situation in which the petitioner argues there's habeas jurisdiction over a factual determination. Is there a problem in that you say that the determination is that the assurances are reliable? Isn't the real determination, the overriding determination, the likelihood that he will be tortured? And do we know that that is the determination that the agency has made, even if it were appropriate for it to be made? Absolutely, Your Honor. Both the declaration or the memo to file of Assistant Secretary Myers, as well as the memo that's in the record or the affidavit that's in the record for our Deputy Assistant Secretary of State, refer to the regulation, saying, pursuant to the following regulations. And the regulations necessitate that exact question, namely whether or not, based on the evidence we have, we could permissibly remove Mr. Khuzam to Egypt consistent with our patent obligations. So, yes, there is certainly record support for that issue. One other point that was implicit in Your Honor's colloquy with opposing counsel was this notion that the executive had somehow overruled the determination of the Second Circuit. And that is simply not the case. The Second Circuit based its decision on the record that was before the agency, that is to say before the immigration judge and the Board of Immigration Appeals. That was the Second Circuit's determination. The assurances, of course, as we all know, were not in the record at that time. So I don't think it's quite accurate to say that the executive is overruling a determination the Second Circuit made. The determination that Secretary Chertoff made was simply that the deferral of removal could be terminated consistent with our patent obligations. Unless there are any further questions from the panel, we respectfully request that the judgment below be reversed. Thank you. The case is very well argued, very difficult case. We'll take it under advisement.